# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **Francine Yates,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No |
| | ) | |
| **Dr. Kumar Moolyail** | ) | **08CV4653** |
| **Walgreens** | ) | **JUDGE KENNELLY** |
| **The Illinois Department of Human Rights** | ) | **MAG. JUDGE MASON** |
| **The Chicago Transit Authority** | ) | |
| **The City of Chicago** | ) | |
| **Otsuka Pharmaceutical Company, Ltd.** | ) | |
| **Bristol-Myers Squibb** | ) | |
| | ) | **RECEIVED** |
| Defendants. | ) | |
| | ) | AUG 1 5 2008 |

Aug 15, 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Complaint for Plaintiff – Francine Yates

Francine Yates
14114 S. Edbrooke Avenue
Chicago, IL 60827
(312) 351-5635
Pro Se

## POINTS AND AUTHORITIES

*775 ILCS 5/6-101* … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …2

*720 ILCS 5/31-4* … … … … … … … … … … … … … … … … … … … … … … … … … … … … … …2

*68 Ill. Admin. Code §1285.240(c) (2001).* … … … … … … … … … … … … … … … … … …3

*735 ILCS 5/2 1706.5* … … … … … … … … … … … … … … … … … … … … … … … … … … …19

*225 ILCS 60/22* … … … … … … … … … … … … … … … … … … … … … … … … … … … … …30

*18 U.S.C. 1621* … … … … … … … … … … … … … … … … … … … … … … … … … … … … …35

*28 U.S.C. 1746* … … … … … … … … … … … … … … … … … … … … … … … … … … … … …35

*28 C.F.R. § 35.130(d)* … … … … … … … … … … … … … … … … … … … … … … … … … …38

*775 ILCS 5/6 101-A* … … … … … … … … … … … … … … … … … … … … … … … … … …45

## CASE LAW

*Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994)*, … … … … … … … … … … … …1

*Byrne v. Boadle  159 Eng. Rep. 299* … … … … … … … … … … … … … … … … … … … … … …16

*Hansen v. Baxter Healthcare Corp., 764 N.E.2d 35, 42 (Ill. 2002)* … … … … … … … … … …  21

*Happel v. Wal-Mart Stores, Inc., No. 90482 (Ill. March 21, 2002)* … … … … … … … … … …26

*Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority  06-3107* … … … … … … … … … … … … … … … … … … … …28

*Richard Goldberg, M.D.   v. The Department of Professional Regulation, Nikki Zollar, Patricia L. Daniels and The Medical Disciplinary Board 1-99-3099* … … … … … … … … … …30

*Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893* … … … … … … … … … … … …38

*Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990)* … … … … … … … … … …38

# I. NATURE OF CASE

This entire ordeal found its inception in the fact that the plaintiff; Francine Y., would not willfully submit to the sexual advances thrust upon her by her manager; Ernest Payne, who was a deacon in Barack Obama's church. Ernest Payne directed repeated sexual advances toward the plaintiff and she continually ignored him. Because the retaliation and workplace oppression became increasingly severe and hostile, the plaintiff did what any normal, reasonable person would have done in order to escape the persecution she was being subjected to. She engaged in the protected activities of complaining to the Chicago Transit Authority, the Illinois Department of Human Rights and the Circuit Court of Appeals. Because the plaintiff rejected her manager's sexual advances, opposed unlawful discrimination and had prior knowledge of fraudulent business practices within the Chicago Transit Authority; Francine Y., was conspired against by CTA's senior management as well as by Dr. Kumar Moolayil. This was done in an effort to remove her from the Chicago Transit Authority's workplace and eventually from society as well.

Dr. Kumar Moolayil's involvement in this case originated from the fact that he was coerced through willful indifference, conscious indifference and wantonness on behalf of Mayor Richard Daley and his entourage. In *Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994),* the Supreme Court was asked to interpret the term "willful misconduct" contained in the Emergency Medical Services Authority. The Court noted in passing that it is unfortunate that the judiciary and the Legislature have used the phrase "willful and wanton misconduct," as opposed to "willful or wanton misconduct" but concluded that the phrases "willful misconduct" and "willful and wanton misconduct" possess distinct meanings. The term "willful" requires a finding of actual intent to harm,

the Court concluded, while the term "wanton" is an intent inferred from reckless conduct. Throughout this entire ordeal, Mayor Richard Daley's intent was to actually inflict harm on the plaintiff. His intent was wanton because the plaintiff sustained many damages and suffered great harm at the hands of Mayor Richard Daley and his entourage.

 Mayor Richard Daley and his entourage have consistently throughout time been personified as being "THE MAFIA." Because many individuals have perceived them as such, they have been coerced into breaking laws, aiding, abetting and obstructing justice. While many have been paid, bribed and threatened, others have surrendered their unannounced, active, and willful participation. A lot of people have cringed at the thought and sound of Mayor Richard Daley's name. Some even hide from his presence. However, this innate perpetual fear that resides in the minds and hearts of these individuals is in and of itself a "false fear." *775 ILCS 5/6-101 Part (B) Aiding and Abetting; Coercion.* It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. *720 ILCS 5/31-4 Obstructing Justice.* A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information.

The Chicago Transit Authority was not sure how much information the plaintiff had against the company relating to fraud or how much she could prove, so they became more aggressive and conspired by fraudulently diagnosing her with psychotic illnesses and used them as the sole basis for her wrongful discharge. The harassment, retaliation and

2

coercion escalated after the plaintiff filed a charge of workplace discrimination. It continued over the years and manifested itself within a variety of forms. To free herself from her harassers; the plaintiff; placed a call to the Federal Bureau of Investigations on June 13, 2008 under the direction of Patrick Fitzgerald's office. As a result, this case has become a high profile Federal case.

## II. ARGUMENT AND DISCUSSION

### *Charge A: Strict Liability, Gross Negligence, Failure to Warn & Breach of Warranty*

Medical malpractice is an act or omission by a health care provider which deviates from accepted standards of practice in the medical community and which causes injury to the patient. It is also an act of professional negligence performed by a healthcare provider that causes injury to the patient. The statute of limitations for medical malpractice in the state of Illinois is two years from the date of the act. However, the state of Illinois is a first discovered state. This means that the plaintiff has two years from the date that they discovered the incident as being erroneous. Gross negligence as defined by the Illinois Board of Professional Regulation is an act or omission which is evidence of recklessness or carelessness toward or a disregard for the safety or well-being of the patient, and which results in injury to the patient. *68 Ill. Admin. Code §1285.240(c) (2001).* The physicians which treated the plaintiff violated ethical standards of the psychiatric medical profession, breached their fiduciary responsibilities to the patient and caused physical and mental harm to the plaintiff who was a member of the public. The Act allows such discipline where the physician engaged in "dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public."

3

Francine Yates; (Francine Y.), was a patient of Dr. Kumar Moolayil for about six months. She was treated and diagnosed in December 2003 with major depression and anxiety. The plaintiff was also diagnosed with high blood pressure in 2003 by her primary healthcare physician.    Another important factor is that the plaintiff was overweight because her body mass index was much higher than its normal index.  The plaintiff was overweight by more than twenty-five pounds which most primary health care professionals define as obesity.  Obesity is a disease in which excess body fat has accumulated to such an extent that health may be negatively affected.  It is commonly defined as a body mass index (weight divided by height squared) of 30 kg/m$^2$ or higher. Francine Y. disclosed this information as well as the fact that she was taking the prescription drugs of hydrochlorothiazide and potassium to control her high blood pressure.  However, in May of 2004, the plaintiff was diagnosed with paranoia by Dr. Kumar Moolayil but she was not aware at that time that Dr. Moolayil committed the act of psychiatric malpractice through gross negligence until she discovered a fraudulent document that was placed within her employment file by Paul Fish.  Francine Y. first discovered that an incident of psychiatric malpractice had occurred in October of 2007 while advocating for herself during the process of retrieving documents from her lawsuit file which was at the Illinois Department of Human Rights.  Because the discovery was made less than a year a year ago and the fact that the plaintiff was mentally incompetent at the time she made the discovery, the statue of limitations in Illinois have been tolled relating to this case. This means that they have been granted a stay from their expiration until the plaintiff recovers from her illnesses.  The plaintiff; Francine Y., was not mentally competent because she was suffering from severe depression and anxiety at the

4

time she made the discovery. Because the plaintiff has experienced constant harassment from Mayor Richard Daley and his entourage, the plaintiff's depression and anxiety have become increasingly severe.

Francine Y. became Dr. Moolayil's patient because Paul Fish; Vice President, of the Capital Investment Department of the Chicago Transit Authority gave the plaintiff a memorandum to seek professional help in November of 2003. The plaintiff used the medical insurance that was provided to her through CTA's medical insurance plan. The psychiatrist was chosen at random from a list of psychiatric healthcare providers located near the plaintiff's home. Dr. Kumar Moolayil is a psychiatric healthcare provider. He diagnosed and treated the plaintiff for anxiety and major depression from the period of December 2003 through May 2004. Throughout this six month process, Dr. Moolayil kept increasing the plaintiff's medication for no apparent reasons. He never provided any substantiated objective medical evidence for the increase in dosages. Eventually, a few weeks prior to the plaintiff's return to work, Dr. Moolayil fraudulently diagnosed the plaintiff with the psychotic mental illness of paranoia. The plaintiff complained to the doctor about the diagnosis. She stated that he made the diagnosis without citing the objective medical evidence to support his prognosis. After Dr. Moolayil engaged in the malicious act of gross negligence, he quickly wrote in his notes that the plaintiff was speaking to fast as being the objective medical evidence for his diagnosis. The plaintiff also asked Dr. Moolayil why he did not send her to see another psychiatrist for a second opinion. Francine Y. was ignored by Dr. Moolayil. He never intended to send her to see another psychiatrist, instead he intentionally breached his fiduciary responsibility and

5

standard duty of care. The plaintiff; Francine Y., has never been afflicted with the psychotic mental illness of paranoia.

In October of 2007, while advocating for herself, the plaintiff discovered a memorandum that Paul Fish had placed in the plaintiff's employment file. The memorandum was dated November 14, 2003. This is when the conspiracy began. The memorandum that was placed in the plaintiff's file was addressed to "File." This was done in an effort to conceal the real person's name to whom the memorandum was in fact addressed to. The memorandum stated that the plaintiff was exhibiting a growing degree of the mental illness known as paranoia. It also stated that her appearance had become unkempt, making it appear that she was wearing soiled clothing from using the bathroom on herself. Mr. Fish also stated that the employees in the Capital Investment area of the Chicago Transit Authority had become afraid of the plaintiff. Paul Fish is not a doctor. He never sat the plaintiff down and counseled with her about any of the things that were mentioned in the memorandum. The plaintiff was unaware that the memorandum was placed within her employment file on or around November 14, 2003. This was more than Paul Fish's erroneous perception of Francine Y. as being afflicted with a psychotic mental illness. His intention was to conspire against the plaintiff in an effort to remove her from service with the Chicago Transit Authority and eventually segregate her in society by having her committed into a mental institution. Paul Fish engaged in this act of gross negligence and malpractice because of his knowledge of federal and state funds which were being embezzled from capital dollars used to fund CTA's, PACE and METRA capital projects. He was protecting his own selfish interests. Prior to becoming an employee with the CTA, Paul Fish worked for the RTA. The RTA is a board which

6

governs how capital dollars are to be spent among CTA, METRA and PACE. Another reason for the conspiracy is the fact that prior to becoming an employee with the Chicago Transit Authority, the plaintiff worked for the Harris Trust and Savings Bank as part of their benefit payment administration team. She worked directly on CTA's pension plan and had knowledge of funds which had been embezzled from the plan. The doctrine of *res ipsa loquitor* applies to this case because "the thing speaks for itself."

On November 25, 2003, Paul Fish gave the plaintiff a directive which removed her from service with the Chicago Transit Authority and simultaneously required her to seek professional help. Paul Fish is not a doctor, nor did he send the plaintiff to see a psychiatrist within the CTA who could have examined and properly diagnosed her. Paul Fish conspired with Dr. Moolayil to fraudulently keep the plaintiff on medical leave for a period of six months. This is evident because the plaintiff was released by her doctor to return to work on April 27, 2004. When the plaintiff returned to work with her doctor's return to work release form, bearing no work restrictions or limitations, the plaintiff was harassed back off of CTA's premises. This caused the plaintiff to relapse. Francine Y. went to see Dr. Moolayil and reported the workplace incident as well as the fact that she relapsed. Between April 27, 2004 and May 27, 2004, Dr. Moolayil breached his standard duty of care through gross negligence. The prima facie evidence is the fact that he engaged in the act of defrauding the plaintiff by willfully conspiring against her and diagnosing her with a mental illness that she does not have, nor has she ever been afflicted with. Dr. Moolayil also prescribed an extremely dangerous drug for the plaintiff which caused her extreme mental and emotional trauma.

The Chicago Transit Authority, the City of Chicago, the Illinois Department of Human Rights and Dr. Kumar Moolayil's underlying motive for defrauding the plaintiff was to commit the act of attempted murder through the use of a self-inflicted drug-induced homicide. This was evident because the plaintiff was given a prescription for psychotic mental illnesses which she does not have and the defendants wanted to make sure that the murder could not be traced back to them. Because all of these entities frequently engaged in the act of fraud, their guilty minds made them strictly liable for the physical, mental and emotional damages inflicted upon the plaintiff.

**Strict liability** is a legal doctrine that makes a person responsible for the damages and losses caused by his/her acts and omissions regardless of culpability. Strict liability is important in torts, product liability, corporation law and criminal law. In tort law, strict liability is the imposition of liability on behalf of the defendants without a finding of fault. Francine Y.; the plaintiff, has proved that the tort happened and that the defendants were responsible. Because strict liability is imposed for legal infractions that are prohibited, neither good faith nor the fact that the defendants took all possible precautions are valid defenses. Strict liability applies to this particular case because the defendants willfully engaged in hazardous and inherently dangerous ventures. Their intent to do so was reckless and done with malice.

The law imputes strict liability to situations it considers to be inherently dangerous. It discourages reckless behavior and needless loss by forcing potential defendants to take every possible precaution. It also has the effect of simplifying litigation and allowing the

victim to become whole more quickly. Strict liability laws can also prevent defendants from raising diminished mental capacity defenses since intent does not need to be proven.

Lastly, in 2003 there was a CTA train that was involved in a collision. An investigation was undertaken which proved that the direct cause of the collision was the fact that the driver of the rapid transit train had taken either an over-the-counter drug or a prescription drug while performing mandatory duties. Also, the glare of the sun in the driver's eyes was also a contributing factor to the collision. In an effort to minimize liabilities and reduce workplace hazards, the CTA established a new policy that all employees working for the Chicago Transit Authority would have to declare all over-the-counter as well as prescription medications they were using while employed with the Chicago Transit Authority. If they failed to do so, the employee would more than likely be terminated from employment with the company. The memorandum was distributed all employees within the company. Because the employees were made to disclose the use of their medication, this gave the doctors and members of senior management within the CTA access to the protected healthcare information of the employees. Since this information was obtained through forcible disclosure, it also opened the door for negligence. The HIPPA Law states that the individual has the right to have their medical health information protected by not being transmitted or communicated verbally, electronically, through written documents or via any other form of media without the individual's knowledge and consent. More than likely, CTA passed some of the employees' protected health information to managers, directors, vice presidents, presidents and the board of directors within the company. Most of these employees are not medical practitioners. By disseminating this information to individuals who are not confidential, unprofessional

9

and extremely immature presents a prima facie case of negligence against the Chicago Transit Authority. Also, if an employee is engaged in a legal proceeding with the employer, communicating their protected healthcare information opens the door for additional harassment, retaliation, a defamation of character lawsuit and a wrongful termination lawsuit as well. Because the management team within CTA's Capital Investment Department had knowledge and access to employees' medical records because of the new policy they created, this gave the company motive for diagnosing Francine Y. with particular psychotic mental illnesses which she does not have. More than likely, Paul Fish and Dr, Angulo; CTA employees, had knowledge of someone within the Capital Investment Department or the company itself who was using the drug Abilify. Another important factor is the fact that Ronald Huberman has harassed and mocked the plaintiff via email about the fact that she may have a negligence claim from using Seroquel. Seroquel is also a drug which is used to treat schizophrenia. He has also sent junk emails to the plaintiff harassing her about drug addition and drug rehab. The plaintiff has never had any addictions to drugs or alcohol. However, some pharmaceutical drugs have the ability to create drug addictions after prolonged use or even after one episode of inducing them. It is the plaintiff's belief that another underlying intent of the conspirators was to have the drug Abilify create a chemical dependency for the plaintiff in an effort to produce a drug overdose in the form of a suicide.

Also, because the plaintiff had filed her charge of discrimination with the Illinois Department of Human Rights before she was intentionally defrauded and the fact that Rod Blajeovich is a part of Mayor Richard Daley's administration as well as his

entourage all gave the defendants motive for fraudulently diagnosing the plaintiff with mental illnesses that she does not have. Some employees within the Illinois Department of Human Rights have been actively engaging in the act of fraud through impeding and obstructing justice by accepting fraudulent documents as substantial evidence and allowing the admission of such documents into legal proceedings. More than likely, someone on the inside of this organization had knowledge of a similar situation in which this drug was used and the employee's fraudulent medical information that was admitted into legal proceedings. The plaintiff also named the Illinois Department of Human Rights as a conspirator and defendant in the original lawsuit which was filed against the Chicago Transit Authority. These facts also gave the Illinois Department of Human Rights motive by aiding, abetting and having the drug prescribed for the plaintiff.

**Product liability** is the area of law in which manufacturers, distributors, suppliers, retailers, and others who make products available to the public are held responsible for the injuries those products cause. In the United States, the claims most commonly associated with product liability are negligence, strict liability, breach of warranty, and various consumer protection claims. The majority of product liability laws are determined at the state level and vary widely from state to state.

In general, product liability claims are based not on negligence, but rather on strict liability. Under the theory of strict liability, a manufacturer is held liable regardless of whether it acted negligently. It allows recovery for an injured customer who might be in a difficult position to prove what a manufacturer did or did not do wrong in its design or manufacturing process. It is presumed that a manufacturer may be in a better situation to

11

absorb the cost of liabilities and would consider such expense in setting the price for its products.

Rather than focus on the behavior of the manufacturer, strict liability claims focus on the product itself. Because strict liability is a harsh regime for a manufacturer, strict liability is applied only to manufacturing defects. This is evident because the manufacturer is forced to pay for all injuries caused by their products, even if they are not at fault. Manufacturing defects occur when a product varies from its intended design.

Otsuka Pharmaceutical Company, Ltd. is the manufacturer which makes the drug Abilify. Otsuka Pharmaceutical Company contracted with Bristol-Myers Squibb Company in an effort to market and distribute Abilify within the United States. The drug Abilify is a member of the class of drugs called atypical antipychotics, popularly prescribed for the treatment of schizophrenia. The other members of this class of drugs include Zyprexa, Risperdal and Seroquel. Abilify was approved for the treatment of schizophrenia in 2002 by the U.S. Food and Drug Administration.

In 2006, Bristol-Myers Squibb was asked by the FDA to add a warning to the popular schizophrenia drug Abilify. Diabetes has the ability to cause extreme physical injuries such s blindness, amputations and even death. The warning will advise patients that Abilify may cause diabetes and other blood sugar disorders such as hyperglycemia. Other possible side effects of the drug may include: fatigue, nausea, constipation, dizziness, restlessness, diarrhea, rash, tremor, and uncontrollable movements.

Otsuka Pharmaceutical Company became liable when the plaintiff discovered the product's manufactured defect. The desired goal and outcome of a pharmaceutical drug should be the ability to make the patient well and/or control the diseases that they have been afflicted with. The product should not make the patient worse off or cause them death through its use. The fact that the drug was readily available to individuals who had the potential and motive to annihilate the patient places a great deal of liability on the pharmaceutical companies as well. Also, what if someone extremely important like a diplomatic official or their loved ones became severely affected by this defective drug? A situation like this could cut off diplomatic relationships. Otsuka Pharmaceutical Company, Ltd. were you not thinking?

Adverse reactions to prescription drugs are a leading cause of death in the United States. In fact, more people die from adverse reactions to prescription drugs than from illegal drugs. Pharmaceutical companies who manufacture defective drugs may be found liable for making and selling a defective product. They may be found liable under the theories of strict liability or negligence if they failed to take reasonable care to keep their products from causing injury. Drug companies selling products in the United States must comply with regulations and procedures mandated by the Food & Drug Administration (FDA). FDA approval however, does not guarantee drug safety. Once the FDA approves a drug for a particular use, patients who are injured by the drug, whether it is used for its approved purpose or for some other reason, must look to the manufacturer for redress. Bristol Myers Squibb cannot assume immunity from liability because the drug company's failure to warn doctors and patients about the drug's dangers, via the drug's warning label, did not meet the new minimum federal standard. This is evident because

the FDA has asked the pharmaceutical manufacturer to add the warning to the product's label to advise the patients and the doctors about the drug's ability to cause diabetes.

Many Americans are in danger from drug company executives that place profits before safety. Because the pharmaceutical company has manufactured a defective product, the right of the plaintiff to hold Otsuka Pharmaceutical Company, Ltd. and Bristol-Myers Squibb negligent and accountable places the plaintiff's ability to recover damages at a higher probability. This accountability and negligence stems from the company's reluctance and failure to meet the minimum federal warning label standards required by the Federal Drug and Administration. The pharmaceutical manufacturer acted negligently by failing to warn patients about the drug's potential dangers and harms associated with the disease diabetes. As a result, Otsuka Pharmaceutical Company Ltd. and Bristol Myers Squibb became strictly liable under state laws.

A federal judge in Minnesota recently rejected the argument that meeting minimum federal warning label standards grants a drug company immunity and wrote, "federal labeling laws are minimum standards; they do not necessarily shield manufacturers from state law liability. Also, state-law protections reinforce and enhance federal efforts to protect the public from negligent pharmaceutical companies and deadly drugs.

Warranties are statements by a manufacturer or seller concerning a product during a commercial transaction. Unlike negligence claims, which focus on the manufacturer's conduct, or strict liability claims, which focus on the condition of the product, warranty claims focus on how these issues relate to commercial transactions. Warranty claims commonly require privity between the injured party and the manufacturer or seller. A

14

warranty is violated when the promise is broken; when goods are not as should be expected, at the time the sale occurs, whether or not the defect is apparent. Breach of warranty based on product liability claims usually focus on one of three types: (1) breach of an express warranty, (2) breach of an implied warranty of merchantability, and (3) breach of an implied warranty of fitness for a particular purpose.

Otsuka Pharmaceutical Company, Ltd. and Bristol-Myers Squibb breached their warranty because the implied warranty of fitness for use that is associated with the drug Abilify did not meet or exceed the expectation which was common to all products. That expectation is that a tool is not unreasonably dangerous when used for its proper purpose unless specifically disclaimed by the manufacturer or the seller. In this particular case, Francine Y.; the plaintiff, thought that she was using the drug Abilify to help control paranoia. However, she found out that she was defrauded by the defendants' intent to conspire against her. Also, because the plaintiff was more than twenty-five pounds overweight at the time she was diagnosed with paranoia, the fact that she is a high-risk candidate because she is an African-American and the fact that the United States federal government gave instructions to Bristol-Myers Squibb to add a warning to the drug's label about diabetes makes Bristol-Myers Squibb liable for breach of an implied warranty of fitness for a particular purpose.

One possible solution to Otsuka Pharmaceutical Company, Ltd. and Bristol-Myers Squibb's dilemma is to recall the drug, fix the defect or take the drug off the market completely. Recalls are actions taken by a firm to remove a product from the market. Recalls may be conducted on a firm's own initiative, by FDA request, or by FDA order

15

under statutory authority. A Class I recall is a situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death. A Class II recall is a situation in which use of or exposure to a violative product may cause temporary or medically reversible adverse health consequences or where the probability of serious adverse health consequences is remote. A Class III recall is a situation in which use of or exposure to a violative product is not likely to cause adverse health consequences. The plaintiff; Francine Y. is asking for a Class I recall because the drug Abilify presents the probability that its use and long-term exposure will create serious health consequences as well as death. Diabetes is a serious health condition. It is one of the leading illnesses that has been known to afflict African-Americans. Individuals with the disease have lost limbs, become blind and even died from it.

The first case to openly discuss the application of strict liability relating to manufacturing defects involved an exploding Coca-Cola bottle. The case actually upheld the plaintiff's *res ipsa loquitur* theory. **Res ipsa loquitur** is a legal term from the Latin meaning literally, "the thing itself speaks" but is more often translated "the thing speaks for itself." It signifies that further details are unnecessary; the proof of the case is self-evident. The doctrine is applied to tort claims which, as a matter of law, do not have to be explained beyond the point where liability is established. It was first formulated in the case *Byrne v. Boadle  159 Eng. Rep. 299.*

The doctrine of *Res ipsa loquitur*  applies to the strict liability tort in this case because the harm would not have ordinarily occurred without the use of the defendant's intentional

16

negligence. Also the harm was caused through the incident of willfully defrauding the plaintiff. This act of fraud was under exclusive control of the defendants at the time the defendants engaged in gross negligence. Lastly, there was an absence of a reasonable legal explanation as to how the harm occurred.

Walgreens is one of the retailers which makes the Abilify product available to the public. As such, they become strictly liable and are held responsible for the injuries those products cause to individuals. Francine Y.; the plaintiff, filled her prescriptions for her medications at a local Walgreens retailer in her neighborhood. Walgreens' liability also stems from their failure to warn. The plaintiff has a claim against the retailer because the incorrect use of the drug was foreseeable by the retailer who was involved within the supply chain. Walgreens owed the plaintiff the duty to warn her about the drug Abilify's potential side affects of producing diabetes and its contraindication of hypersensitivity, they breached their fiduciary duty when they failed to warn the plaintiff. Francine Y. sustained injuries which arose as a direct result of the breach of duty on behalf of Walgreens.

However, because the mistake was made by pharmacists and/or pharmacy technicians in the state of Illinois, the plaintiff has no further recourse against the pharmacists. The underlying reason for this is the fact that the pharmacists are not required to carry malpractice insurance in the state of Illinois. In an effort to hold the pharmacists socially responsible for their own actions, the United States Federal government should enact legislation against the pharmacists requiring them to carry heavy limits of liability for negligence claims. Because they are handling medication and the lives of the patients are

17

being placed within their hands, remaining willfully indifferent, obtuse or disinterested in the patient's care are not acceptable forms of behavior. One simple mistake could cause permanent disfigurement or death to a patient. Lastly, because the pharmacy technicians do not have pharmacy degrees, they should not be handling any medication within the pharmacy. Their responsibilities should entail other duties which are related to the pharmacy like ordering supplies, maintaining a clean pharmacy department, directing customers as to where they can find over-the-counter medications, etc.

On April 1, 2007, the Pharmacists Profession Regulation to the Health Professions Act came into effect. This regulation authorized a new scope of practice for Alberta pharmacists. The new practice framework authorizes several elements relating to prescribing fundamentals. One element is that of documentation. The pharmacists' prescriptions must be written and signed by the pharmacist. With this new authority, the pharmacists must carry a minimum of $2 million of personal liability insurance. Also, in the patient's record, they must record the prescribing decision, their rationale and the follow-up plan.

A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others. Inherent in practicing as a physician, is the fiduciary responsibility that an authoritative person or group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility

18

and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the client and the entity the agents are employed with. Dr. Kumar Moolayil failed as an agent acting on behalf of the plaintiff. He did not fulfill his fiduciary responsibilities to the plaintiff. Dr. Kumar Moolayil owed the plaintiff the fiduciary duty and responsibility of giving her an accurate, ethical and objective professional medical evaluation. This duty was breached when Dr. Moolayil failed to conform to the relevant standard duty of care through engaging in fraud by aiding, abetting and obstructing justice. Dr. Moolayil diagnosed the plaintiff with a psychotic mental illness that she did not have which was used to separate her from employment and eventually segregate her in society by having her committed into a mental institution.

He failed to conform to this standard of care because he kept increasing the plaintiff's dosages and strength of her anxiety and depression medications without any substantiated, objective medical evidence or a legal medical reason for doing so. Over a very short period of six months, Dr. Moolayil vehemently transitioned the plaintiff from the mental illnesses of major depression and anxiety to the psychotic illness of paranoia. Dr. Moolayil did not exercise discretion as a reasonable psychiatrist would have done based upon the all of the facts that the plaintiff disclosed to him while she was receiving treatment under his care. Because the plaintiff's mental illnesses were sustained from the harassment and retaliation associated with an employment discrimination lawsuit, Dr. Kumar Moolayil did not exercise enough prudence which would have been required for making an accurate, objective medical evaluation for the plaintiff while she was under his care. He breached the standard of care because he deviated from the course of action that

19

a reasonable person would have taken in an effort to correctly diagnose the plaintiff. He did not follow established psychiatric guidelines which disclosed the required scientific evidence needed to make the diagnosis. Secondly, Dr. Moolayil did not request the assistance and collaboration between medical and psychological professionals involved in the treatment and care of the condition known as paranoia. Lastly, Dr. Kumar Moolayil did not proceed with caution as a prudent physician; instead, he vehemently transitioned the plaintiff over to a psychotic mental illness known as paranoia. Although he treated the plaintiff; Francine Y., for a period of six months, the diagnosis of paranoia was made within a few weeks upon the plaintiff's return to work.

The diagnosis was imprudent and impetuous, meaning it was made out of ignorance and with haste.    This was an act of malpractice and an obvious error performed by Dr. Kumar Moolayil because he never sent the plaintiff; Francine Y., to another psychiatrist for a second opinion. Also, Dr. Kumar Moolayil never provided the plaintiff with the psychiatric objective medical evidence as proof that she was in fact afflicted with paranoia. He diagnosed her with the mental illness in May of 2004 prior to her return to work on May 27, 2004. When the plaintiff questioned his integrity, Dr. Moolayil defrauded the plaintiff by adding erroneous symptoms to the plaintiff's medical file. Francine Y. asked Dr. Moolayil why he believed she was inflicted with this psychotic illness and why he did not send her to another psychiatrist to receive a second opinion. Dr. Moolayil was dumbfounded. He did not respond. This was done to cover up the malpractice and the fraudulent diagnosis. He told the plaintiff that the objective medical evidence was the fact that she was talking too fast. He quickly added the fraudulent notes into the plaintiff's medical file. Dr. Moolayil also gave the plaintiff a prescription for a

20

dangerous psychotic drug called Abilify. Abilify is drug which is primarily used to treat bipolar disease and schizophrenia. It was approved by the Food and Drug Administration (FDA) on November 15, 2002. Francine Y. does not have any of these mental illnesses nor has she ever been diagnosed with them. It is only the sixth atypical antipsychotic medication of its kind. The drug had been on the market for about one and a half years when it was prescribed for the patient and not enough had been discovered about the drug's potential long term side affects. However some common side affects are Akathisia, headache, unusual tiredness, unusual weakness, nausea, vomiting, an uncomfortable feeling in the stomach, constipation, weight gain, light-headedness, trouble sleeping, restlessness, sleepiness, shaking, and blurred vision. Some of the drugs uncommon side affects include uncontrollable twitching or jerking movements, tremors and seizures. Some people may feel dizzy, especially when getting up from a lying or sitting position, or may experience a fast heart rate. The drug also has rare side affects which are: combination of fever, muscle stiffness, faster breathing, sweating, reduced consciousness, and *sudden change in blood pressure and* heart rate (neuroleptic malignant syndrome). The drug's very rare side effects include: allergic reaction (such as swelling in the mouth or throat, itching, rash), increased production of saliva, speech disorder, nervousness, agitation, fainting, reports of abnormal liver test values, inflammation of the pancreas, muscle pain, weakness, stiffness, or cramps. Also, while taking Abilify some elderly patients with dementia have suffered from strokes or mini strokes. Other patients may experience high blood sugar or the onset or worsening of diabetes. Lastly, if taken over long periods of time, the drug can induce death. *Hansen v. Baxter Healthcare Corp., 764 N.E.2d 35, 42 (Ill. 2002).*

The plaintiff took the medication because her depression and anxiety heightened and she trusted Dr. Moolayil.   After she took the medication, she began to hallucinate. Hallucinations are not part of the common, uncommon or rare side affects that were listed on the website for the drug Abilify.   This is due to the fact that all the known possible side affects had not yet been discovered because the drug had only been on the market for about one and a half years during the time it was prescribed for the plaintiff.   The side affect from the drug produced a hallucination in the form of a long, very thick, white, bloody snake which was wrapped around the plaintiff's neck.   However, the image was not real.   The plaintiff called Dr. Moolayil in May of 2004 to complain about his diagnosis as well as the side affects from the medication.   He intentionally ignored the patient's complaint.

Dr. Moolayil also breached his standard duty of care because he did not take into consideration any preexisting conditions and other medications that the plaintiff was using while under his care.   The plaintiff told the doctor that she was also being treated for high blood pressure when she counseled with him during her first visit.   The medications that the plaintiff disclosed that she was using were hydrochlorothiazide and potassium.   The plaintiff disclosed this information because she knew how important it was to be honest with her doctor and the fact that her health could be in great danger if she was taking too many of the wrong kind of drugs simultaneously.   Dr. Moolayil failed to warn the plaintiff about the rare side affect of a sudden change in blood pressure related to the drug's use.

In medicine, a contraindication is a condition or factor that increases the risks involved in using a particular drug, carrying out a medical procedure, or engaging in a particular activity. Some contraindications are *absolute,* meaning that there are no reasonable circumstances for undertaking a course of action. For example, a baby with a fever should never be given aspirin because of the risk of Reye's syndrome, and a person with an anaphylactic food allergy should never eat that food. Other contraindications are *relative,* meaning that the patient is at higher risk of complications, but that these risks may be outweighed by other considerations or mitigated by other measures. For example, a pregnant woman should normally avoid getting X-rays, but the risk may be far less than the risk of not diagnosing or being able to treat a serious condition such as tuberculosis or a broken bone. Hypersensitivity is a contraindication for the drug Abilify. Obesity, as a preexisting condition, often leads to diabetes among African-Americans because their diets contain vast amounts of starches and saturated fats. The plaintiff was more than twenty-five pounds overweight at the time Dr. Moolayil prescribed the drug for her use. Lastly, the plaintiff complained to Dr. Moolayil about the hallucination she experienced after taking the drug Abilify. Dr. Moolayil remained willfully and consciously indifferent. Her never directed her to stop using the drug.

Dr. Moolayil breached his standard duty of care by engaging in gross negligence through fraud and also by failing to research the drug Abilify because it had been out on the market for less than two years at the time he prescribed it for the plaintiff. Most importantly, he willfully failed to warn the plaintiff about the potential risks and harmful side affects of the drug. Dr. Moolayil either received money through a bribe, he was

23

coerced (meaning he was punked) or he remained willfully indifferent and took advantage of a mentally disabled woman who had no legal representation.

The Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights owed the plaintiff the fiduciary responsibility and duty of giving her case an objective and ethical consideration by not allowing fraudulent documents to be admitted into legal proceedings. They breached their fiduciary duties when they willfully conspired against the plaintiff by diagnosing her with fraudulent psychotic mental illnesses that she does not have.


While the plaintiff was under Dr. Moolayil's care, she filled her prescriptions at a local Walgreens pharmacy in Dolton, IL. Every month, the plaintiff used Walgreens to fill one prescription for two high blood pressure medications, one prescription for depression and one prescription for anxiety. The pharmacist, acting as an agent on behalf of Walgreens had a fiduciary responsibility and duty to warn the patient's psychiatrist as well as the patient of the serious risks involved with taking the drug Abilify. The pharmacist never warned the plaintiff about the drug's serious side affects or its contraindication of hypersensitivity when used with other drugs like high blood pressure medication. Abilify, when taken over a period of time also affects the patient's blood sugar levels. Because the pharmacist failed to warn the plaintiff or her psychiatrist about all the potential dangers relating to the patient's mental and physical health based on the prescriptions they filled for her as well as her physical appearance, they became liable in the act of gross negligence. This information was especially important because the plaintiff was under the care of her primary health care physician and being treated her for

24

high blood pressure.  Francine Y. disclosed her diagnosis and treatment for high blood pressure to the Chicago Transit Authority, the Illinois Department of Human Rights, Walgreens and Dr. Kumar Moolayil.  Another important fact is that the plaintiff made physical appearances in person each time she filled her prescriptions at Walgreens. Because she made physical appearances, one could visibly see that she was overweight. Over the six month period while the plaintiff was on medical leave, the pharmacists could have easily looked at the plaintiff's prescriptions and saw that the psychiatrist kept increasing the strength of the plaintiff's medications with an abrupt change that included an additional, extremely dangerous medication.  The pharmacy owed the plaintiff and her psychiatrist the fiduciary responsibility and duty to warn about the drug's contraindication as well as its ability to produce a multitude of negative side effects.  The plaintiff, Francine Y., never received any warning from the pharmacist or her psychiatrist.  Also, during the time that the drug was prescribed for the plaintiff, Abilify had only been on the market for about one and a half years.  Since this is a very short time and the drug is extremely dangerous, Walgreens owed the plaintiff the fiduciary responsibility of monitoring the drug, its patient's use and additional dangerous side affects.  Lastly, if Walgreens did not have Dr. Moolayil's signature on file, they should not have been filling any of the patient's prescriptions.  Otsuka Pharmaceutical Company and Bristol-Myers Squibb owed the plaintiff the fiduciary duty of creating a product that was fit for its intended use.  They became liable when they breached their fiduciary duties and responsibilities by creating a product which has the capability of producing a deadly disease known as diabetes and other blood sugar disorders.   The pharmaceutical companies are also liable because they failed to attach a warning to the drug's label

relating to the disease diabetes. Also, no one knows what the potential long-term side affects of inducing pharmaceutical medication may entail. The plaintiff wanted to have a baby and was planning on getting married right before the conspiracy took place. In the case of *Happel v. Wal-Mart Stores, Inc., 766 N.E.2d 1118, 1127,* the pharmacy had knowledge of patient's allergy and drug contraindication. As a result, the court ruled that the pharmacy had a duty to either notify the physician or warn the patient of the potential danger. The drug's name itself; Abilify, is derived from the word ability. This name should have presented a question in the minds of the pharmacist and the pharmacy as to what the drug's abilities and capabilities entail.

Dr. Moolayil conspired along with the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights through the use of coercion, willful indifference, conscious indifference and wantonness in an effort to fraudulently progress the plaintiff to an extreme prognosis of two psychotic mental illnesses. The conspirator's intent was to outwardly deceive, inflict pain, deliberately break the law, separate the plaintiff from service with the Chicago Transit Authority and eventually segregate her in society by placing her into a mentally ill institution. This conspiracy was intentional and done with malice which caused great harm to the plaintiff. They placed their own interests above the interests of an innocent, mentally handicapped, African-American, Christian woman. The Chicago Transit Authority and Dr. Kumar Moolayil took advantage of the plaintiff because she was without legal representation. They were in a position of authority and power, but took no measure to use their power and influence to protect, defend or assist the plaintiff. Francine Y. needed their help more than anything else.

26

Because Dr. Moolayil and Dr. Angulo breached their duty by deviating from what a prudent psychiatrist and primary health care physician would have done, the plaintiff sustained many additional injuries. Francine Y. became severely depressed, her anxiety heightened, she became homeless, experienced a lot of additional harassment, sexual harassment, retaliation, persecution, heavy surveillance by police officers, a false arrest, a false battery charge, she was perceived to be psychotic, she was perceived to be dangerous by others and she was afflicted with an attempted murder by use of a drug-induced homicide. The plaintiff trusted both doctors. Because they failed to fulfill their fiduciary duties to the plaintiff as their patient, their breach of duty was one of the approximate causes of the plaintiff's mental and emotional distress becoming greater than it was. Also, when the plaintiff returned to work on May 27, 2004, Dr. Ismael Angulo examined the plaintiff and diagnosed her with Schizophrenia. Dr. Angulo is an agent for the Chicago Transit Authority. He is not a psychiatrist. He fraudulently diagnosed the plaintiff with the psychotic mental illness of schizophrenia without any objective medical evidence to support his diagnosis.   This harmed the plaintiff because Dr. Angulo conspired along with CTA's Vice President, Paul Fish and Dr. Moolayil by using fraudulent diagnoses to wrongfully discharge the plaintiff from service with the Chicago Transit Authority. Their intent to characterize the plaintiff as such was reckless and it was done with malice.

Paranoia is often associated with psychotic illnesses, particularly schizophrenia, although attenuated features may be present in other primarily non-psychotic diagnoses, such as paranoid personality disorder. Paranoia is a disturbed thought process characterized by excessive anxiety or fear, often to the point of irrationality and delusion.    The plaintiff,

27

Francine Y., has never been afflicted with paranoia or schizophrenia. The defendants were trying to have her removed from CTA's workplace because they did not have an equitable defense in a true court of law. Also, extreme cases of mental illness are difficult to prove. Instead they resorted to lies, fraudulent employment practices, conspiracy, fraud and coercion in an effort to wrongfully discharge the plaintiff. As time progressed, the plaintiff's mental and emotional state grew worse. She became homeless, enduring homelessness and its side affects for about three years. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel and The Chicago Transit Authority, 1-06-3107.*

Francine Y.; the plaintiff, was also inflicted with intentional emotional and mental distress by Dr. Kumar Moolayil, Walgreens, the Illinois Department of Human Rights, the City of Chicago, the Chicago Transit Authority, Otsuka Pharmaceutical Company and Bristol Myers Squibb. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the plaintiff was conspired against by diagnosing her with fraudulent psychiatric conditions that she did not have. These diagnoses were used to remove the plaintiff from service with the Chicago Transit Authority. The plaintiff; Francine Y., was outraged when she was being diagnosed with paranoia and schizophrenia which were used as the basis for her separation from service with the Chicago Transit Authority because of their reckless and malicious intent to conspire against her. The plaintiff; Francine Y., was vulnerable because she was an African-American woman who was mentally handicapped and without effective legal representation. Dr. Moolayil, the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights were all aware of the fact that the plaintiff was a

black woman who was mentally disabled and without effective legal representation. The first day the plaintiff came to see Dr. Kumar Moolayil for treatment, she engaged herself in a full discussion with the doctor about her referral to seek professional help. After she explained the nature of her problem which involved sexual harassment and workplace discrimination, Dr. Moolayil asked if the plaintiff had an attorney. The plaintiff stated "no, I don't." The defendants were all in positions of power. Because the plaintiff was without legal representation, they conspired, took advantage of the situation and remained willfully and consciously indifferent. More than likely, Paul Fish conspired with Dr. Moolayil by giving him a copy of the memorandum dated November 14, 2003 that he placed in the plaintiff's personnel file without her knowledge or consent. Lastly, the defendants owed the plaintiff the fiduciary responsibilities and duties of giving her a correct, just and ethical medical evaluation; warning about the drug's contraindications and side affect of producing the deadly disease diabetes and abiding by the law. These actions, subsequent actions and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. It became worse as time progressed and she endured the trauma of homelessness, its side effects, increased harassment, sexual harassment, heavy surveillance, retaliation, coercion and an attempted murder through the use of a drug-induced homicide.

Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, mentally handicapped, homeless, African-American, Christian woman who had no effective legal representation. They were in positions of authority, but took no measure to use their power and influence to protect, defend or assist the

plaintiff. The plaintiff; Francine Y., needed their help more than anything else. *Richard Goldberg, M.D. v. The Department of Professional Regulation, Nikki Zollar, Patricia L. Daniels and The Medical Disciplinary Board 1-99-3099.*

**The Medical Practice Act of 1987** *225 ILCS 60/22* sates the following in Section 22. Disciplinary action. A) The Department may revoke, suspend, place on probationary status, or take any other disciplinary action as the Department may deem proper with regard to the license or visiting professor permit of any person issued under this Act to practice medicine, or to treat human ailments without the use of drugs and without operative surgery upon any of the following grounds: (4) Gross negligence in practice under this Act. (5) Engaging in dishonorable, unethical or unprofessional conduct of a character likely to deceive, defraud or harm the public. (6) Obtaining any fee by fraud, deceit, or misrepresentation. (9) Fraud or misrepresentation in applying for, or procuring, a license under this Act or in connection with applying for renewal of a license under this Act .(10) Making a false or misleading statement regarding their skill or the efficacy or value of the medicine, treatment, or remedy prescribed by them at their direction in the treatment of any disease or other condition of the body or mind. (20) Immoral conduct in the commission of any act including, but not limited to, commission of an act of sexual misconduct related to the licensee's practice. (21) Willfully making or filing false records or reports in his or her practice as a physician, including, but not limited to, false records to support claims against the medical assistance program of the Department of Public Aid under the Illinois Public Aid Code. 22) Willful omission to file or record, or willfully impeding the filing or recording, or inducing another person to omit to file or record, medical reports as required by law, or willfully failing to report an instance of suspected

abuse or neglect as required by law. (24) Solicitation of professional patronage by any corporation, agents or persons, or profiting from those representing themselves to be agents of the licensee. (25) Gross and willful and continued overcharging for professional services, including filing false statements for collection of fees for which services are not rendered, including, but not limited to, filing such false statements for collection of monies for services not rendered from the medical assistance program of the Department of Public Aid under the Illinois Public Aid Code. (26) A pattern of practice or other behavior which demonstrates incapacity or incompetence to practice under this Act. (30) Willfully or negligently violating the confidentiality between physician and patient except as required by law. (31) The use of any false, fraudulent, or deceptive statement in any document connected with practice under this Act. (32) Aiding and abetting an individual not licensed under this Act in the practice of a profession licensed under this Act (36) Failure to report to the Department any adverse judgment, settlement, or award arising from a liability claim related to acts or conduct similar to acts or conduct which would constitute grounds for action as defined in this Section. (37) Failure to transfer copies of medical records as required by law. (38) Failure to furnish the Department, its investigators or representatives, relevant information, legally requested by the Department after consultation with the Chief Medical Coordinator or the Deputy Medical Coordinator. (39) Violating the Health Care Worker Self Referral Act. (41) Failure to establish and maintain records of patient care and treatment as required by this law. **735 ILCS 5/2 1706.5 Standards for Economic and Non-economic Malpractice Damages** In any medical malpractice action or wrongful death action based on medical malpractice in which economic and non economic damages may be awarded, the following standards

31

shall apply: (1) In a case of an award against a hospital and its personnel or hospital affiliates, as defined in Section 10.8 of the Hospital Licensing Act, the total amount of non economic damages shall not exceed $1,000,000 awarded to all plaintiffs in any civil action arising out of the care. 2) In a case of an award against a physician and the physician's business or corporate entity and personnel or health care professional, the total amount of non-economic damages shall not exceed $500,000 awarded to all plaintiffs in any civil action arising out of the care. (3) In awarding damages in a medical malpractice case, the finder of fact shall render verdicts with a specific award of damages for economic loss, if any, and a specific award of damages for non economic loss, if any. The trier of fact shall not be informed of the provisions of items (1) and (2) of this subsection (a). (b) In any medical malpractice action where an individual plaintiff earns less than the annual average weekly wage, as determined by the Illinois Workers' Compensation Commission, at the time the action is filed, any award may include an amount equal to the wage the individual plaintiff earns or the annual average weekly wage. **720 ILCS 32-2 Perjury.** (a) A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. (b) Proof of Falsity. An indictment or information for perjury alleging that the offender, under oath, has made contradictory statements, material to the issue or point in question, in the same or in different proceedings, where such oath or affirmation is required, need not specify which statement is false. At the trial, the prosecution need not establish which statement is false. (c) Admission of Falsity. Where the contradictory statements are made in the same continuous trial, an admission

32

by the offender in that same continous trial of the falsity of a contradictory statement shall bar prosecution therefore under any provisions of this Code. (d) A person shall be exempt from prosecution under subsection (a) of this Section if he is a peace officer who uses a false or fictitious name in the enforcement of the criminal laws, and such use is approved in writing as provided in Section 10-1 of "The Liquor Control Act of 1934", as amended, Section 5 of "An Act in relation to the use of an assumed name in the conduct or transaction of business in this State", approved July 17, 1941, as amended, or Section 2605-200 of the Department of State Police Law **(20 ILCS 2605/2605-200)**. However, this exemption shall not apply to testimony in judicial proceedings where the identity of the peace officer is material to the issue, and he is ordered by the court to disclose his identity. (e) Sentence. Perjury is a Class 3 felony punishable for up to five years. **The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191**, was enacted on August 21, 1996 to protect individual's health information. The Privacy Rule protects all *"individually identifiable health information"* held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information *"protected health information (PHI)."* OCR Privacy Rule Summary 4 Last Revised 05/03 *"Individually identifiable health information"* is information, including demographic data, that relates to: the individual's past, present or future physical or mental health or condition, the provision of health care to the individual, or the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe can be used to identify the individual. Individually identifiable health information includes many common identifiers (e.g., name, address,

33

birth date, social security number). The Privacy Rule excludes from protected health information employment records that a covered entity maintains in its capacity as an employer and education and certain other records subject to, or defined in, the Family Educational Rights and Privacy Act, **20 U.S.C. §1232g.** *(See Exhibits in Appendix Section)*

### Charge B: Fraud, Conspiracy, Bribery, Extortion, Fraudulent Practices & Acts

Fraud, in addition to being a criminal act, is also a type of civil law violation known as a tort. A tort is a civil wrong for which the law provides a remedy. A civil fraud typically involves the act of intentionally making a false representation of a material fact, with the intent to deceive, which is reasonably relied upon by another person to that person's detriment. A "false representation" can take many forms, such as: a false statement of fact, known to be false at the time it was made; a statement of fact with no reasonable basis to make that statement; a promise of future performance made with an intent, at the time the promise was made, not to perform as promised; a statement of opinion based on a false statement of fact; a statement of opinion that the maker knows to be false; or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" in this case means knowledge or information superior to that possessed by the other party, and to which the other party did not have equal access.

Dr. Kumar Moolayil intentionally diagnosed the plaintiff with paranoia and told her that the objective medical evidence that was the basis for his diagnosis was that the plaintiff was talking too fast. The statement was false, known by him to be false at the time it was made and used to deceive a mentally handicapped, African-American, Christian woman

34

who had no effective legal representation. The documented evidence of the plaintiff's fraudulent disability is also an act of perjury because the document needs to be admitted as evidence in a court of law.

Perjury is the act of lying or making verifiably false statements on a material matter in a court of law or in any of various sworn statements in writing. It is important that the false statement be material to the case at hand, because it could affect the outcome of the case. Perjury can also be interpreted as a form of fraud. Perjury is considered a serious offense as it can be used to usurp the power of the courts; resulting in miscarriages of justice; or as in the case of 1-06-3107, overt abortions of justice. In the United States, the general perjury statute under Federal law provides for a prison sentence of up to five years, and is found at *18 U.S.C. 1621 and 28 U.S.C. 1746.*

In the case of *Francine Yates v. The Illinois Department of Human Rights, the Chief Legal Counsel and the Chicago Transit Authority, 1-06-3107,* the defendants used vicious lies, fraudulent employment practices and the admission of fraudulent medical documents as substantial evidence into legal proceedings. Paul Fish; CTA's Vice President of Capital Investment, placed a memorandum dated November 14, 2003 in the plaintiff's employment file without her knowledge or consent. The memorandum stated that the plaintiff was exhibiting a growing degree of a mental psychotic condition known as paranoia. The plaintiff is not mentally ill as perceived by Paul Fish and Paul Fish is not a doctor. His motive for retaliating against the plaintiff and diagnosing her with a psychotic condition stems from the fact that he has knowledge of federal and state funds that are being embezzled from capital dollars used to fund CTA's capital improvement

35

projects. Before Paul Fish came on board with the CTA, he worked for the RTA which is a board that directs how government funds are to spent at CTA, PACE and METRA.

Also, because Francine Y. worked directly on CTA's pension account when she was an employee at the Harris Trust and Savings Bank, she had knowledge of money that had been embezzled from the company's pension plan. In an effort to annihilate the plaintiff, CTA, the City of Chicago, the Illinois Department of Human Rights and Dr. Kumar Moolayil conspired to commit the act of attempted murder through a self-inflicted drug-induced homicide. Because the drug Abilify was used in this act of conspiracy and the fact that the drug was easily accessible to villains who are perceived as being "THE MAFIA", Otsuka Pharmaceutical, Ltd. and Bristol-Myers Squibb Company became liable. The pharmaceutical companies are also liable for willfully defrauding mentally ill patients by deliberately not placing a warning on the drug's label about the deadly disease diabetes.

Paranoia is often associated with psychotic illnesses, particularly schizophrenia, although attenuated features may be present in other primarily non-psychotic diagnoses, such as paranoid personality disorder. Paranoia is a disturbed thought process characterized by excessive anxiety or fear, often to the point of irrationality and delusion. Schizophrenia is the medical condition that the plaintiff was diagnosed as having by Dr. Ishmael Angulo, a doctor who works for the CTA. Dr. Ishmael Angulo is not a psychiatrist nor did he examine the plaintiff for any mental illnesses. Dr. Kumar Moolayil conspired along with the Chicago Transit Authority and the Illinois Department of Human Rights to fraudulently diagnose the plaintiff with a psychotic illness so extreme that she would

36

have to be removed from the workplace and eventually from society by being placed within a mental institution. Dr. Moolayil either received money through bribery, was coerced or he remained willfully indifferent and intentionally made the wrongful diagnosis. The State of Illinois is directly responsible for allowing the fraudulent medical documents to be used as substantial evidence for admission into judicial proceedings. The Department has a legal team which should be skilled in the law. They should have used the Mental Health and Developmental Disabilities Code for establishing psychiatric testimony to rule the decision of the plaintiff's wrongful discharge because of her fraudulent disabilities as being unconstitutional on its face. Paul Fish is not a doctor and Dr. Ismael Angulo is not a psychiatrist.

If the defendants fraudulently defrauded the plaintiff; Francine Y., by using their prior knowledge of the fact that someone at the CTA has been afflicted with any disease that is associated with the use of Abilify, then the defendants have willfully engaged in the act of fraud. Likewise if anyone within the Illinois Department of Human Rights had prior knowledge of someone's medical information relating to paranoia, Schizophrenia or Abilify that was admitted into legal proceedings through the use of fraudulent acts, they have participated in the willful act of fraud as well.

The non-rhetorical question within this scenario is how many other patients has Dr. Moolayil done this to and how many are being kept fraudulently under his medical care in an effort for Dr. Moolayil to fill his pockets by defrauding private insurances and Medicare? On Friday, July 25, 2008, the plaintiff called Dr. Moolayil's office to obtain her medical file. The secretary told her it would take some time to get the file because

37

she was treated several years ago and the fact that Dr. Moolayil has about 12,000 patients. This is a large number of patients for one doctor to treat in a given year even if he treats eight patients per day. Some would even believe that Dr. Moolayil is mainly writing prescriptions as opposed to providing effective, competent counseling and medical care along with the use of appropriate medication. The plaintiff; Francine Y., has never been afflicted with paranoia or schizophrenia. The defendants were trying to have her removed from society and eventually committed into a mental institution. The two parties were collaborating through cohesive measures while the plaintiff was on a medical leave of absence. Dr. Kumar Moolayil was either punked, paid or both. _Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990)._

On June 22, 1999, the United States Supreme Court held in _Olmstead v. L.C._ that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination based on disability. The court ruled that the Americans with Disabilities Act may require states to provide community-based services rather than institutional placements for individuals with disabilities. This historic pronouncement makes attainable a goal long-sought by people with disabilities and advocates. _Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893._ A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *28 C.F.R.§ 35.130(d).*

**720 ILCS 5/8  Conspiracy.** (a) Elements of the offense. A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless

38

an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator. (b) Co-conspirators. It shall not be a defense to conspiracy that the person or persons with whom the accused is alleged to have conspired: (1) Has not been prosecuted or convicted, or (2) Has been convicted of a different offense, or (3) Is not amenable to justice, or (4) Has been acquitted, or (5) Lacked the capacity to commit an offense. (c) Sentence. A person convicted of conspiracy may be fined or imprisoned or both not to exceed the maximum provided for the offense which is the object of the conspiracy, except that if the object is an offense prohibited by Sections 11-15, 11-16, 11-17, 11-19, 24-1(a)(1), 24-1(a)(7), 28-1, 28-3 and 28-4 of the "Criminal Code of 1961", approved July 28, 1961, as amended, or prohibited by Sections 404 or 406 (b) of the "Illinois Controlled Substances Act", enacted by the 77th General Assembly, or an inchoate offense related to any of the aforesaid principal offenses, the person convicted may be sentenced for a Class 3 felony however, conspiracy to commit treason, first degree murder, aggravated kidnapping, aggravated criminal sexual assault, or predatory criminal sexual assault of a child is a Class 1 felony, and conspiracy to commit any offense other than those specified in this subsection, and other than those set forth in Sections 401, 402, or 407 of the Illinois Controlled Substances Act, shall not be sentenced in excess of a Class 4 felony. **Extortion, Outwresting,** or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection*. Extortion is commonly practiced by organized crime groups. The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a

39

requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force, additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the blackmailer threatens to do something which would be legal or normally allowed. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property

or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness. (f) Sentence. Bribery is a Class 2 felony. **720 ILCS 5/29A-2 Accepting a Bribe.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **720 ILCS 5/8 1.2 Solicitation of Murder for Hire.** (a) A person commits solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value. (b) Penalty. Solicitation of murder for hire is a Class X felony and a person convicted of solicitation of murder for hire shall be sentenced to a term of imprisonment of not less than 20 years and not more than 40 years. **720 ILCS 5/8 1.1 Solicitation of Murder.** (a)

A person commits solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense. (b) Penalty. Solicitation of murder is a Class X felony and a person convicted of solicitation of murder shall be sentenced to a term of imprisonment for a period of not less than 15 years and not more than 30 years, except that in cases where the person solicited was a person under the age of 17 years, the person convicted of solicitation of murder shall be sentenced to a term of imprisonment for a period of not less than 20 years and not more than 60 years. **720 ILCS 5/8-4 Attempted Murder.** A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense. **720 ILCS 5/9-3.3 Drug-induced homicide.** (a) A person who violates Section 401 of the Illinois Controlled Substances Act or Section 55 of the Methamphetamine Control and Community Protection Act by unlawfully delivering a controlled substance to another, and any person's death is caused by the injection, inhalation or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide. (b) Sentence. Drug-induced homicide is a Class X felony. (c) A person who commits drug-induced homicide by violating subsection (a) or subsection (c) of Section 401 of the Illinois Controlled Substances Act or Section 55 of the Methamphetamine Control and Community Protection Act commits a Class X felony for which the defendant shall in addition to a sentence authorized by law, be sentenced to a term of imprisonment of not less than 15 years and not more than 30 years or an extended term of not less than 30 years and not more than 60 years. **720 ILCS 5/12-4.1 Heinous Battery.** (a) A person who, in committing a battery, knowingly causes severe and permanent disability, great

bodily harm or disfigurement by means of a caustic or flammable substance, a poisonous gas, a deadly biological or chemical contaminant or agent, a radioactive substance, or a bomb or explosive compound commits heinous battery.   (b) Sentence. Heinous battery is a Class X felony for which a person shall be sentenced to a term of imprisonment of no less than 6 years and no more than 45 years.   *(See Exhibits in the Appendix Section)*

### Charge C: Retaliation/Basis:  Whistle Blowing & Opposing Unlawful Discrimination

The plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, the Illinois Department of Human Rights and the City of Chicago in 2004, 2006 and 2007.  Also, on June 13, 2008, the plaintiff engaged in the protected activity of complaining about the additional harassment, sexual harassment, a false arrest, heavy surveillance, coercion and an attempted drug-induced homicide that she was experiencing from Mayor Richard Daley and his entourage.  She complained to the Federal Bureau of Investigations under the direction of Patrick Fitzgerald's office.  As a result, this case has escalated into a high profile Federal case.     Francine Y. was retaliated against by the Chicago Transit Authority, the City of Chicago, the State of Illinois, Dr. Kumar Moolayil, Otsuka Pharmaceutical and Bristol-Myers Squibb Company.  The retaliation consisted of the following acts:   1.) violating the HIPPA Act by disclosing CTA's employees protected health information; 2.) conspiring against the plaintiff by having Dr. Moolayil prescribe the drug for the plaintiff because the defendant's had prior knowledge of the drug's use from their fraudulent disclosure policy;  3.) Otsuka Pharmaceutical Company and Bristol-Myers Squibb Company's negligence in creating a drug which is more harmful to the patients using the drug than it is helpful; 4.) Bristol-Myers Squibb failing to have a label on the drug which warned the

patients in advance about all of the drug's contraindications and the fact that it could cause the deadly disease known as diabetes; 5.) Ronald Huberman sending the plaintiff junk emails harassing her and mocking her about the fact that she may have a Seroquel negligence claim; 6.) the Illinois Department of Human Rights conspiring with the CTA by disclosing employees' protected health information; 7.) conspiring to annihilate the plaintiff through the use of a self-inflicted drug-induced homicide; 8.) Otsuka Pharmaceutical and Bristol-Myers Squibb Company producing a drug that makes patients worst off than they were before taking the medicine as an act of retaliation because they are ill, some of the results from the medication even produces the side effect of death; 9.) Otsuka Pharmaceutical and Bristol-Myers Squibb Company treating patients as if they are useless by manufacturing defective products in an effort to maximize profits, because their product caused great harm to the patients their true gain was filthy lucre.  The defendants' actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation.

The **Whistleblower Enhancement Protection Act of 2007** prohibits retaliation against public employees who report official wrongdoing.  The Whistleblower Act states that "a state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. A federal agency violates the Whistleblower Protection Act if it takes, fails to take or threatens by failing to take a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law,

rule or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. **H.R. 985 Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act. The **Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an **adverse action** against a **covered individual** because he or she engaged in **a protected activity**. *775 ILCS 5/6-101(A)(2006). (See Exhibits in the Appendix Section)*

## III. CONCLUSION

The Chicago Transit Authority had several employees conspiring against the plaintiff as well as outside entities associated with this case. Some of the outside entities were a law school, Chicago police officers and Dr. Kumar Moolayil. This was done because the plaintiff had knowledge that money has been embezzled out of CTA's pension fund. However, the conspirators were doing a very poor job of working together. Paul Fish's and Dr. Moolayil's erroneous perception of the plaintiff as a mentally disabled employee, their willful intention to commit fraud and all other actions relating to such helped to increase the liability associated with this case. The defendants had no legal remedies that they could use in a true court of law, so they resorted to fraud and fraudulent activities in lieu of an equitable defense. The plaintiff; Francine Y., was intentionally

discriminated against by Dr. Kumar Moolayil, The Chicago Transit Authority and the Illinois Department of Human Rights because she opposed unlawful discrimination. Their intent to do so was reckless, malicious and overwhelmingly destructive. The defendants were all in a position of power. They knew the plaintiff was an African-American Christian woman who was homeless, mentally disabled and without effective legal representation. They took advantage of the situation because they thought that they were going to get away with it. However, the plaintiff took a stand in the face of adversity and opposed unlawful discrimination, enduring a great deal of persecution. Dr. Kumar Moolayil was in a position to help the plaintiff; however, he chose to break the law by intentionally ignoring the plaintiff's complaints, violating her rights, aiding, abetting and obstructing justice. This case should be an embarrassment, a shame and a disgrace to Dr. Kumar Moolayil, the Chicago Transit Authority, the Illinois Department of Human Rights and the City of Chicago. The plaintiff, Francine Y., is asking for a summary judgment to be rendered in favor of the plaintiff with no appeals granted on behalf of the defendants. The plaintiff is also seeking relief from the district court in the form of the following remedies: injunctive relief, all harassers to be disciplined and separated from service, damages for mental anguish/mental cruelty, psychological & emotional pain from suffering, shame, indignity, disgrace, embarrassment, humiliation, demoralization, anger, discomfort, inconvenience, delay, worry, distress, anxiety, stress, malice, oppression, conscious indifference, willful indifference, deep depression, homelessness & side affects, feelings of sorrow, torment, powerlessness and exclusion, future continued indefinite suffering, damages for intentional infliction of emotional and mental distress, damages for negligent intentional infliction of emotional and mental

46

distress, damages for a diminished quality of life, loss of opportunity potential, attorney fees, expert witness fees, punitive damages, pecuniary/non-pecuniary damages, damages for malpractice, all workplace torts, damages for fraud & conspiracy to commit fraud, all actions enabling the applicant to be made whole, all other compensatory damages. This brief is respectfully submitted by Francine Yates.


Francine Yates

## PROOF OF SERVICE

I, the undersigned plaintiff, certify that on the _____ day of _____, _____, I
served a copy of this _____ to each person to whom it is directed by
way of _____.


TO:    Dr. Kumar Moolayil                The Illinois Department of Human Rights
       15475 S. Park Avenue              Attn:  Chief Legal Counsel
       South Holland, IL  60473          100 W. Randolph Avenue
                                         Chicago, IL  60601


       The Chicago Transit Authority     The City of Chicago
       Attn:  Ronald Huberman            Attn:  Mayor Richard Daley
       567 W. Lake Street                121 N. LaSalle Street
       Chicago, IL  60606                Chicago, IL  60601


       Walgreens                         Bristol-Myers Squibb Company
       Attn:  Pharmacy Department        Attn:  Legal Department
       1150 E. Sibley Blvd               345 Park Avenue
       Chicago, IL  60419                New York, NY  10154-0037

       Otsuka America, Ltd.
       Attn:  Legal Department
       1 Embarcadero Center
       Suite 2020
       San Francisco, CA  94111


                                    _____
                                    Francine Yates, Pro Se
                                    14114 S. Edbrooke Avenue
                                    Riverdale, IL  60827
                                    (312) 351-5635

**APPENDIX**

Yahoo!    My Yahoo!    Mail    More         **Make Y! My Home Page**        Hi, beyondtheregular        Sign Out    All-New Mail

Help

## YAHOO! MAIL Classic

Search                                        **WEB SEARCH**

| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                  **Search Mail**    **Search the Web**

See online trading in action

Previous | Next | Back to Search Results

**Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**

**Folders**    [Add - Edit]

**Inbox (41330)**
Drafts (4)
Sent
**Spam (14497)**   [Empty]
Trash    [Empty]

**Search Shortcuts**
My Photos
My Attachments

ADVERTISEMENT
Do you know Your Credit Score?

I Don't Know      ????

### Get that someone you love help today with a drug rehab info.
From: "Addiction Therapy" <AddictionTherapy@hopefultool.com>

To: beyondtheregular@yahoo.com

Get that someone you love help today with a dru...



**Drug Rehab**
Get that someone you lo...

**End Opiate Abuse**
Detox at Home & Avoid High Cost Of Rehab. Get
Immediate Relief Now.
meditoxofpalmbeach.com

**Addiction Treatm**
Rehab Specializing
CA & TN. Call Now
rehabandtreatment.c

**Click Here**

To unsubscribe or "opt-out" from receiving further e-mails from MyDirectWeb.com, go to http://c.MyDirectWeb.c
My Direct Web,  5718 Westheimer Suite 1240, Houston, TX 77057

Your email address has been verified to receive offers from one of our affiliates. We resp
to abuse your email address. If you prefer not to receive further emails of this type, click

Customer Care ST
601 Van Ness Ave., Suite E, #739, San Francisco, CA 941

Yahoo!    My Yahoo!    Mail    More          **Make Y! My Home Page**          Hi, beyondtheregular          Sign Out          All-New Mail

Help

# YAHOO!® MAIL
Classic

| Search | **WEB SEARCH** |

ENVISION YOURSELF
WINNING¹ A
MACBOOK AIR

ACUVI
THE DIFFERENCE E

GET YOUR FREE
PAIR CERTIFIC.

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

Check Mail    Compose                              Search Mail    Search the Web

Top Electronics on
Y! Shopping

Previous | Next | Back to Search Results

Delete    Reply ▼    Forward    Spam    More ▼

**Folders**    [Add - Edit]

**Inbox (41328)**

Drafts (4)

Sent

**Spam (14497)**    [Empty]

Trash    [Empty]

**Drug rehab will get you clean.**                                    Mon

From: "Drug Rehab" <DrugRehab@zoomisle.com>

To:  beyondtheregular@yahoo.com

<u>Drug rehab will get you clean.</u>

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

FREE Checking.
No Strings.

Open an Account
Swap to Bank of the

Bank of America



**DRUG REHA**

Personalized treatment. Personalized

**Drug Rehab**
Click for free info
rehab treatments
& alcohol depend

**RECOVER**

**Drug Rehab**
Overwhelmed? C
for information on
and alcohol...